## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.                                                      Case No: 10-CR-00471

NEVIN KAREY SHAPIRO,

```
              RECEIVED

             MAR 27 2023

             Chambers of
        Honorable Susan D. Wigenton
```

Defendant.

## MOTION FOR COMPASSIONATE RELEASE PURSUANT

## TO 18 U.S.C. § 3582(c)(1)(A)(i)

Mr. Nevin Shapiro, pro se, respectfully moves this Court to grant compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by the failing health of his mother and father ("parents"). Mr. Shapiro is the primary caregiver to his parents and as their illnesses progress his responsibilities also increase.

As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Such reasons are present due to Shapiro's mother and father who are both elderly and experiencing health challenges which will

1

be explained herein.  In addition, Mr. Shapiro, who was transferred to home confinement under the CARES Act, has his own health issues related to skin cancer, hypertension, and heart disease.

At this time, Mr. Shapiro has exhausted his administrative remedies and requests that this Court reduce his sentence to time served or, in the alternative, modify his Judgement to allow him to serve a portion of his term of supervised release under the supervision of US Probation. (See Exhibit A - *Request to RRM for Compassionate* Release).  No response was received by the RRM and it has been over 30 days since Mr. Shapiro's submission.  Mr. Shapiro is currently on home confinement, serving his sentence as part of the provisions under the CARES Act to allow inmates to serve their prison term on home confinement due to underlying health conditions that pose a risk to an adverse reaction to COVID-19.

### RELEVANT FACTS ABOUT MR. SHAPIRO

Mr. Shapiro voluntarily surrendered on April 21, 2010, to serve a 240-month sentence. As of March 1, 2023, Mr. Shapiro has served over 154 months of his 240-month sentence. Over the term of his incarceration, Mr. Shapiro has had excellent institutional adjustment, held various jobs in prison and, has worked with authorities to return assets to those affected by the collapse of Capitol Investments USA. the company identified as part of the charges against Shapiro. Since his placement on home confinement, Mr. Shapiro has not only cared for his parents, but has dealt with his own health issues while finding ways to give back to society through sharing his story with college students.

Lawrence Shapiro, Mr. Shapiro's father, is 78 years of age. Lawrence suffered a stroke on August 5, 2020, and has complete blockage of his corroded artery.  Lawrence's health has been in decline since his stroke and is no longer able to drive, which has increased his reliance of Mr. Shapiro. Mr. Shapiro shops for Lawrence and takes him to all his medical appointments.

2

Mr. Shapiro's mother, Ronnie Adams, is 75 years of age and suffered a vascular stroke as well while Mr. Shapiro was incarcerated. She has now been diagnosed with Dementia. Her cognitive skills have declined significantly in the three years that Mr. Shapiro has been home and her condition is only going to decline in the coming years. Mrs. Adams lives in Canada and is relocating to Boca Raton in April 2023 to be near Mr. Shapiro who will become her primary care giver. As with Mr. Shapiro's father Lawrence, Mr. Shapiro will be responsible for providing his mother her medications and taking her to doctor visits.

While incarcerated in Bureau of Prisons facilities, Mr. Shapiro participated in classes and taught classes. He excelled in a 6-month, faith-based Threshold program. The program requires strict adherence to attendance, participation and accepting responsibility for one's past actions. While taking these classes, Mr. Shapiro worked in food services as it provided flexibility to allow him to participate in programs and recreational activities.

Since the beginning of his incarceration, Mr. Shapiro embarked on a time of self-reflection, service to others and a commitment to emerge from prison as a better person.

Mr. Shapiro has a release plan in place. In fact, he has successfully integrated himself back into society for almost three years since being placed on home confinement under the CARES Act. BOP frequently interacts with prisoners in a home confinement placement, including through daily monitoring, weekly in person meetings, drug and alcohol testing, and counseling, and retains discretion to reconsider home confinement at any time. This monitoring is done in coordination with US Probation and the Residential Reentry Manager (RRM or halfway house). Mr. Shapiro has a few infractions, which are presented to this Court along with some context related to those incidents. He has successfully complied with the strict rules of his

home confinement. He has clearly demonstrated his remorse and his ability to successfully reintegrate back into society.

It should be noted that under the CARES Act, inmates still have the possibility of being returned to prison at the discretion of the BOP. While the Biden Administration Office of Legal Counsel concluded on December 21, 2021, that "Bureau's preexisting authorities are better read to give the Bureau discretion to permit prisoners in extended home confinement to remain there." That discretion clearly includes the possibility of returning inmates to prison if so desired. It is Mr. Shapiro's position that such a move would not serve the intention of this Court because the progress made during home confinement would be lost in a return to prison with even more limited opportunities.

Mr. Shapiro has job opportunities to generate income awaiting him if he is allowed to travel, something that is prohibited under his current conditions. These opportunities are in the entertainment industry and will allow him to not only care for his family but also contribute to ongoing restitution requirements. Currently, job opportunities are limited in the South Florida area for Mr. Shapiro because of the notoriety of his case, however, this is where his parents live and that has become his primary responsibility. In addition, Mr. Shapiro does not have the financial means to leave the area and has relied on living with his father Lawrence and his wife, Frances.

Regarding restitution, while incarcerated Mr. Shapiro worked with receivers for Capitol Investments USA to help achieve recovery of $40 million in funds (Exhibit B). He is currently involved in depositions in a civil lawsuit in the Broward County Florida (Muscato v Currie) where he is a witness for investor plaintiffs seeking to obtain funds from one of Mr. Shapiro's

4

former business associates. If successful, that litigation would lead to millions of dollars additional dollars recovered for investors.

In 2010, Mr. Shapiro was a highly successful businessman who employed 100 employees, engaged a top accounting firm and took legal guidance from a top legal firm. During that success, Mr. Shapiro made several poor decisions. Taking responsibility for his own actions, Mr. Shapiro has paid a tremendous price and has shown his ability to be a contributing member of society. He now hopes to be able to support his parents and continue his work as an active member of society. A time-served sentence serves the interests of justice.

## LEGAL FRAMEWORK OF COMPASSIONATE RELEASE

### Compassionate Release Before the First Step Act

The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to reassess whether a sentence reduction was warranted by factors previously addressed through the abolished parole system. The Sentencing Commission defined "extraordinary and compelling reasons" as including medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, comm. n.1(A). As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the BOP. But, over three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria.

### Compassionate Release After the First Step Act

On December 21, 2018, the President signed the First Step Act into law, significantly changing § 3582, most significantly by allowing defendants to directly petition courts for relief

instead of leaving relief decisions solely with the BOP. 18 U.S.C. § 3582(c)(1)(A). The compassionate release statute, as amended by the First Step Act, authorizes district courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and the Sentencing Commission's applicable policy statements—regardless of the BOP's position.

Thus, a district court can grant a sentencing reduction under 18 U.S.C. § 3582(c)(1)(A), where "extraordinary and compelling reasons warrant such a reduction" and "a reduction [would be] consistent with applicable policy statements issued by the Sentencing Commission." Mr. Shapiro's request for compassionate release does not ask the Court to review a BOP decision. Rather, the statutory responsibility to decide whether to extend compassionate release to Mr. Shapiro rests solely with the Court. Moreover, since the First Step Act took effect, courts have continued to expand compassionate release, finding "extraordinary and compelling reasons" in circumstances beyond, or combined with, the factors of age, medical condition, and family needs that the BOP has typically identified.

## CRIMINAL CASE BACKGROUND

On April 21, 2010, Mr. Shapiro self-surrendered to authorities based on the filing of a criminal complaint which alleged Mr. Shapiro knowingly and intentionally conspired with six ( 6) other co-conspirators to commit securities and wire fraud, in violation of Title 15, United States Code, Section §78j(b) and 78ff(a), Title 17, Code of Federal Regulations, Section §240-1 Ob-5, and Title 18, United States Code, Section §2; and Money Laundering in violation of Title 15, United States Code, Sections§78j(b) and 78ff(a), Title 17, Code of Federal Regulations, Section §240.1 Ob-5, and Title 18, United States Code, Section §2, that were of a value greater than $10,000.00 dollars.

Mr. Shapiro was sentenced on June 7, 2011, to 240 months in federal prison. Since entering prison, Mr. Shapiro has adjusted well to institutional living and, due to underlying health conditions, was placed on home confinement by the BOP under provisions of the CARES Act. The CARES Act allowed the BOP to move health-vulnerable inmates to home confinement to complete their sentence away from the communal setting of prison where COVID-19 infected thousands and killed hundreds of inmates and staff.

Since being placed on home confinement, Mr. Shapiro has continued to have an impeccable record of compliance and giving back to both his family and society.

## ARGUMENT

The Court has the authority to consider Mr. Shapiro's motion because he has exhausted his administrative remedies with the BOP when RRM Lori P. Beardon and more than 30 days have gone by since that submission without a response.

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons (BOP), Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." In this case, the timing provision has been satisfied. On January 28, 2023, Mr. Shapiro submitted a request for reduction in sentence to the RRM Lori P. Beardon since he is under the supervision of RRM Miami as part of his home confinement. RRM Beardon did not respond to his request.

7

Mr. Shapiro has exhausted his administrative remedies. *See*, e.g., *United States v. Joling*, 2020 WL 1903280, at *2 (D. Oregon April 17, 2020) (quoting *Brown v. United States*, 411 F. Supp. 3d 446, 452 (S.D. Iowa 2019) ("Exhaustion occurs when the BOP denies a defendant's application or lets thirty days pass without responding to it.").

The Court can reduce Mr. Shapiro's sentence if he meets two criteria: (1) "extraordinary and compelling reasons warrant" reduction; and (2) the reduction is consistent with Sentencing Commission "policy statements" found in U.S.S.G. § 1B1.13. See U.S.S.G. § 3582(c)(1)(A). The Commission set forth three specific categories qualifying as extraordinary and compelling: terminal medical conditions, medical debilitation, and family circumstances. U.S.S.G. § 1B.13 cmt.1(A)–(C). But recognizing these categories might not encompass the wide range of compelling reasons, the Commission added a catch-all—"other reasons"—which may act "in combination" with the prior categories or might be wholly independent. See U.S.S.G. § 1B1.13 cmt.1(D).

Under Section 3582, as amended by the First Step Act, a court may modify a defendant's sentence "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). Upon such a motion, the court may modify a defendant's sentence "after considering the factors set forth in § 3553(a) to the extent that they are applicable," if it finds "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

The Commission has not issued any applicable policy statements since the enactment of the First Step Act. The only policy statement relating to compassionate release, § 1B1.13, was adopted prior to the Act's amendments. "The very first words of the Guideline are 'upon motion of the Director of the Bureau of Prisons,' which is precisely the requirement that the First Step Act expressly removed." *United States v. Brooker,* 976 F.3d at 236. Thus, § 1B1.13 "is clearly outdated and cannot be fully applicable." *Id.* Because of this, at least four circuit courts of appeal to consider the issue have held that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Id.* at 235-36; see *McCoy,* 981 F.3d at 275–88; *United States v. Jones,* 980 F.3d 1098 (6th Cir. 2020); *United States v. Gunn,* 980 F.3d 1178 (7th Cir. Nov. 20, 2020). At least courts in the Second, Fourth, Sixth, and Seventh Circuits agree on the point that § 1B1.13 is not controlling.

## MR. SHAPIRO'S FAMILY CIRCUMSTANCES

Mr. Shapiro's family circumstances are "compelling and extraordinary." Mr. Shapiro is an only child and both of his parents, Lawrence (age 77) and Robbie (age 73), have both suffered strokes while Shapiro was incarcerated. His mother suffers from dementia and Shapiro will be her medical caregiver when she relocates to Florida from Canada. Mr. Shapiro's mother currently resides in Canada but is relocating to Florida because she has no caretaker in Canada.

Shapiro lives close to his father who suffered a stroke just weeks after Shapiro was transferred to home confinement in June 2022.

Of importance, courts have rejected the narrow reading of compassionate release to exclude parents in need of caregivers and held that the First Step Act modified the role of the Bureau of

Prisons in the compassionate release process to exercise broader discretion in evaluating motions by defendants for compassionate release.

It should also be pointed out that the timing of the First Step Act (2018) and the subsequent Covid-19 pandemic (2020) has afforded courts the opportunity to more frequently contemplate, define and expand the various bases for compassionate release.

As a result, other courts have begun to recognize that caring for a parent when there's no one else to fill that role constitutes an "extraordinary and compelling" reason to grant compassionate release. *See United States v. Riley*, No. 2:12-cr-62, 2020 U.S. Dist. LEXIS 82909 (D. Vt. May 12, 2020) (compassionate release granted based on age, asthma, and defendant's father's failing health and him being the only person available to provide his father's daily care.); *United States v. Hernandez*, Case No. 16-20091 (S.D. Fl. April 3, 2020) (extraordinary and compelling reasons warranting a compassionate release reduction where defendant was the only possible caregiver for his 84-year old mother suffering from degenerative ocular disease and cancer (in remission) that renders her functionally blind and has mobility issues); see also *United States v. Lisi*, 2020 U.S. Dist. LEXIS 31127 (S.D.N.Y. Feb. 24, 2020) (court found that if the defendant's claims are factually accurate, and he is the only person capable of caring for his mother, then that would constitute an extraordinary and compelling reason for compassionate release.); *United States v. Nagi*, No. 06-CR-20465, 2021 WL 5114579, at *5 (E.D. Mich. Nov. 3, 2021) ("[T]his Court finds the need to care for an incapacitated parent to be an extraordinary and compelling reason for a sentence modification when there are no other caregivers available.").

Even with the brunt of the Covid-19 pandemic seemingly in the rearview mirror, courts are willing and continuing to find that caring for an ailing parent is a legitimate basis for release:

> Mr. Trapps seeks compassionate release to care for his mother, Ms. Johnson, who recently suffered a stroke that left her

paralyzed on one side of her body and in need of around-the-clock care. Mr. Trapps' family members are unable to act as full-time caregivers to Ms. Johnson. His sister has physical limitations that prohibit her from providing the care Ms. Johnson requires. (See Dkt. 83-1, Exs. C, E.)

Mr. Trapps' brother works full-time outside of the home to provide for himself and his family, and he is unable to take more time off work to care for his mother without jeopardizing his employment. (Id., Exs. F-G.) Mr. Trapps' nephew also works outside of the home to support himself. (Id., Ex. H.) If released, Mr. Trapps plans to reside with his mother at her home and is willing and able to provide care for her.

Probation has approved Mr. Trapps' proposed living arrangement upon release. (See Dkt. No. 87.) 2 *United States v. Trapps* 15-cr-00382-JSW-1 (N.D. Cal. Nov. 4, 2022) The Court finds Mr. Trapps has established extraordinary and compelling reasons justifying his release because he has shown that his mother is incapacitated and that he is the only available caregiver who can provide the assistance that his mother requires.

*United States v. Trapps.* 15-cr-00382-JSW-1, at *1 (N.D. Cal. Nov. 4, 2022).

While we understand that other inmates may have ailing parents, it is less likely that each of those families is in the same circumstances where the parents have no other suitable options. Mr. Shapiro will be able to get and provide prescribed and over the counter medications, clean the house, cook for the family, handle odd jobs around the house that Mr. Shapiro's father can no longer do, and other chores as needed. Furthermore, Mr. Shapiro could also respond to many of the needs illustrated above for his parents, both physically and financially.

It is evident that in very recent years, courts are beginning to recognize the need to support a parent (especially when there is only one available caregiver who can provide such support) as criteria meeting extraordinary and compelling circumstances justifying release. As

11

such, Mr. Shapiro's request when considered with the factors below, should be granted by this honorable Court.

## MR. SHAPIRO'S OWN HEALTH ISSUES

Mr. Shapiro has his own health issues which were part of his being transferred to home confinement as part of the CARES Act. Shapiro was diagnosed with Hypertrophic Cardio Myopathy of which he was diagnosed with in 2003. He has undergone numerous tests and has seen some of the best doctors who have all concluded the same diagnosis. He also suffers from extreme Hypertension and all his medical reports were noted in his BOP intake. Shapiro believes that he was not given proper treatment for his care in his (10) plus years inside the BOP's custody. His condition in fact worsened and Shapiro has been hospitalized (2) times since his transfer to home confinement due to sever hypertension related to pre-stroke symptoms.

Mr. Shapiro was diagnosed with Basal Cell Carcinoma which is a form of skin cancer while in BOP custody and had approximately 85 stitches put in his face and head to remove the threat of cancer spreading. The BOP allowed this condition for (8) years until a doctor at Shapiro's camp in Montgomery, Alabama questioned why it had not been treated.

### 3553(a) Factor Considerations

With full consideration of the § 3553(a) factors, time served is sufficient to accomplish the goals of sentencing.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Granting compassionate release to Mr.

12

Shapiro is also consistent with the sentencing factors in 18 U.S.C. § 3553(a). These factors include "the nature and circumstances of the offense" and "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law . . . to provide just punishment for the offense . . . to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. §3553(a).

Mr. Shapiro took full responsibility for his crimes. He later accepted responsibility by pleading guilty and has assisted in recovery of assets.

In addition, his offense conduct was non-violent, and he had previous no criminal history. See PSR. From the time of arrest, Mr. Shapiro was never allowed bail and managed his case with his attorney while incarcerated at MDC Brooklyn.

Mr. Shapiro, of his own volition, took it upon himself to participate in sharing his story with university students to help them understand white collar crime, the consequences of crime and the perspective of a white-collar perpetrator. Participating in a fraud and forensic accounting class at Fordham University, Shapiro has presented his story and taken questions in multiple class sessions. Professor Timothy Hedley, PhD, teaches the class and is a retired partner from the accounting firm KPMG where he headed its global forensic accounting practice. Dr. Hedley's insight combined with Mr. Shapiro's story provided an excellent learning experience for future forensic accountants and businesspeople (EXHIBIT C). Mr. Shapiro was not compensated for any of these appearances.

## EDUCATION

In federal prison, there are no classes required of inmates other than the General Educational Development program that documents classes and final testing for the high school equivalency exam. Mr. Shapiro was put into General Population of BOP in September 2011 and

was able to put together an impressive resume of courses in which he participated and others where he taught.   He completed a (6) month long Threshold Program, which is a faith-based, comprehensive program where participants learn about goal setting, relationships, journaling, and how to apply their faith to better decision making.   In many cases, inmates discover a new perspective on how to treat and respect each other.   Mr. Shapiro not only participated in the class as a student but taught sections of the class. There was no tolerance for absence or else inmates lose the credits.   Mr. Shapiro had perfect attendance.

Mr. Shapiro's Individualized Reentry Plan identified a number of courses in which he participated including:

- Business Planning Class
- Debate Class
- Resume Writing
- Basic Accounting
- Real Estate Investment
- #3 Personal Finance
- Etiquette for Men
- Credit Awareness
- Business development
- Communication Skills
- Debt Negotiation
- Anger Management
- Disease Prevention
- Weight Management
- Dress Success
- Money Management Skills
- Career Planning
- AIDS Awareness
- Anatomy and Physiology
- Creative Writing
- OSHA Rules and Regulations
- Calculus
- Circuit Training
- Health Fair
- Yeshiva Re-entry Class
- Adult Continuing Education – Success
- Earth's History

14

- Adult Continuing Education – The Human Body
- How to Study
- Self-Study / Building Trust
- Africa
- Four Stages of Interviews
- Self-Study / Clear Writing
- The Joy of Stress
- The Theory of Evolution
- A Question of Race
- 10 Keys to Sales and Finance

In addition, Mr. Shapiro volunteered to be on suicide watch in the Solitary Housing Unit for preventative measures.

## DISCIPLINARY INFRACTIONS IN PRISON

There are four levels of severity the BOP utilizes to categorize misconduct reports. Those categories are: Greatest, High, Moderate and Low Moderate. Examples of Greatest severity prohibited acts are rioting, taking hostage(s), possession of narcotics, and possession of a weapon. High severity incident reports would include fighting, extortion/bribery, and threatening conduct. Moderate severity level misconduct may be for refusal to obey an order, insolence toward staff, lying, or being in an unauthorized area. The least severe misconduct violations are low moderate severity level and include acts like using abusive language, unauthorized physical contact with a visitor, possessing another inmate's property, or conducting a business.

While inmates are expected to conduct themselves in an appropriate and orderly manner, other factors in a prison environment do not always make it conducive for this expectation to be realized. The demographics within low security prisons often include inmates with significant criminal histories and little incentive to better themselves, making it difficult to maintain a positive adjustment, even for those inmates who have good intentions.

15

Enforcement and consequences of incident reports result in a variety of disciplinary sanctions. The sanctions differ in severity and are administered based on the seriousness of the misconduct. Sanctions range from extra duty, verbal/written reprimands, loss of privileges, disciplinary segregation, with the more severe misconduct resulting in loss of good conduct time. Sustained guilty findings for incident reports usually have a negative impact an inmate's overall security and custody score, which at times, results in a transfer to a more suitable prison which can better address the inmate's security needs.

In the 10 plus years since Mr. Shapiro entered the federal correctional system for continued service of his prison sentence, records indicate he received three incident reports. My intent is not to minimize these infractions, but in my experience, inmates serving lengthy sentences, often incur several misconduct reports, especially when housed in low security level prisons over the course of 10 years. Overall, Mr. Shapiro has no incident reports in the greatest (100 level), two in the high (200 level) category and the remaining one was a moderate (300) level infraction. The following contains greater details of the incident reports Mr. Shapiro received and the sanctions imposed.

- April 29, 2013, Code 328, Giving / Receiving Money or Anything of Value from Another Inmate, FCC Oakdale, Sanctions Imposed: Loss of commissary privileges.
  Description of Incident: Mr. Shapiro received money an inmate that was deposited into his account so that he could correspond with members of the media who had reached out for comment. Inmates are responsible for paying for their own phone calls and the financial burden of such expenses primarily fell on Mr. Shapiro's family as his prison job only paid under $50/month. The journalists wished to help Mr. Shapiro and they paid an inmate's family who in turn put money on Mr. Shapiro's account. Mr. Shapiro acknowledged he infraction, took responsibility and learned from the experience.

- September 16, 2013, Code 296, Circumventing Mail Monitoring Procedures, FCI Butner, Sanctions Imposed: Loss of phone privileges for 90 days, Loss of commissary for 90 days.

  Description of Incident: Mr. Shapiro put an envelope addressed to the member of the NCAA inside of another envelope to another member of the NCAA. At the time, Mr. Shapiro was concerned about how his communication with the NCAA and the publicity it might cause. His concern was as much for those he was communicating with as much as himself. In the correspondence he was providing information on the payment of players at the University of Miami football program.

- October 13, 2013, Code 299, Conduct Which Disrupts the Orderly Running of the Institution, FCI Butner, Sanctions Imposed: Loss of Good Conduct Time of 27 days, Disciplinary Segregation 90 days, Monetary Fine of $100, Loss of telephone privileges 1 year.

  Description of Incident: Mr. Shapiro was angered when an article was written about him in a local Miami paper. He wrote to the writer of the article and expressed his concerns about the accuracy. The journalist then complained to local authorities that he interpreted Mr. Shapiro's words as a threat. The conduct code demonstrates that the letter from Shapiro was not something that was serious enough to rise to a credible threat.

It should be noted that Mr. Shapiro is presenting this information so that the Court has a complete understanding of his time in federal prison as a measure of the person he has become. These incidents occurred in 2013 when Mr. Shapiro was gaining more contact with the outside world and the University of Miami scandal was more pronounced. As someone who looked after many of the players at the University of Miami, he felt compelled to speak on their behalf as well as to justify his actions with the university. Mr. Shapiro has had no incident reports since October 13, 2013, nearly 10 years without an incident. In addition, he moved down security levels over that time from Minimum Security to Minimum Security / Community Custody which he is at today.

When the Court looks at these incidents, realize that drugs, alcohol and cell phones in prison are readily available for inmates. Mr. Shapiro's incidents do not involve any

17

infractions of this nature and reflect a discipline of avoiding the prison culture which leads to numerous infractions.

Since being on home confinement, Mr. Shapiro has had no incident reports nor warnings from those at the halfway house or U.S. Probation. He routinely interacts with those in society through grocery shopping, doctor appointments, pharmacy trips and religious services.

## CONCLUSION

Mr. Shapiro has participated in meaningful activities to prove that he is a changed person. His own health issues and those of his aging parents have put more pressure on him to be able to care for them. He has proven over nearly three years of being on home confinement that he can contribute to society. Mr. Shapiro has also expressed his personal feelings about this compassionate release request in a letter to this Court (Exhibit D). He also enjoys the support of The Aleph Institute who provided a letter to President Donald Trump in a request for Clemency (Exhibit E).

18

For the foregoing reasons, Mr. Shapiro respectively submits this compassionate release to the Court asking for the immediate release from custody and reduce his sentence to time served or any other non-custodial arrangement with conditions this Court deems appropriate. As Mr. Shapiro does not have funds to hire appropriate legal counsel and understanding that his was a complex case, he requests Court appointed legal counsel to further argue this matter.

Respectfully submitted,

Nevan Shapiro

Reg No: 61311-050

8045 Whispering Palm Dr,
Boca Raton, FL 33496

19

## Verification

I certify that a true copy of the foregoing documents was filed under SEAL and sent to the Respondent in this action by U.S. First Class Mail and via electronic mail, as I am proceeding Pro Se.

Executed on this 16th day of March 2023.

Respectfully Submitted,

Nevin Shapiro

20

## CERTIFICATE OF SERVICE

I, Nevin Shapiro, certify that the foregoing is true, correct, and made with my firsthand knowledge pursuant to the penalty of perjury, pursuant to 28 U.S.C § 1746(1), that on the date affixed below I did mail via First Class Priority Mail the following documents:

Motion Requesting Compassionate Release

Exhibits A-E

Certificate of Service

Said documents were mailed to the United States District Court, District of New Jersey, Address: Martin Luther King Building and U.S. Courthouse, Courtroom MLK 5C, U.S. District Court Judge Susan Wigenton, 50 Walnut Street, Newark, NJ 07102.

This filing is requested to be submitted under seal due to the confidential nature of its contents. I am mailing via USPS the above documents to the current U.S. Attorney Office in New Jersey via mail:

Office Of The US Attorney
970 Broad Street
Suite 700
Newark, NJ 07102

Executed this 16th day of March 2023.

Respectfully Submitted,

Nevin Shapiro
8045 Whispering Palm Dr.
Boca Raton, FL 33496

21

# EXHIBIT A



**UNITED STATES POSTAL SERVICE.**

CPU BULK IN BINS
9101 LAKERIDGE BLVD STE 22
BOCA RATON, FL 33496-9924
(800)275-8777

01/24/2023                    05:03 PM
--------------------------------------
Product         Qty   Unit    Price
                      Price
--------------------------------------
First-Class Mail@  1           $1.26
Large Envelope
   Miami, FL 33128
   Weight: 0 lb 0.80 oz.
   Estimated Delivery Date
      Fri 01/27/2023
   Certified Mail@                $4.15
      Tracking #:
         70212720000041377874
Total                            $5.41

--------------------------------------
Grand Total:                     $5.41
--------------------------------------
--------------------------------------

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
            1-800-222-1811.

            Preview your Mail
            Track your Packages
            Sign up for FREE @
   https://informeddelivery.usps.com

All sales final on stamps and postage.
      Thank you for your business.

--------------------------------------

UFN: 110855-5560.
Receipt #: 840-23300500-1-1555480-2
Clerk: 00



Deliverep 1/26/23

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com.

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$
Sent To  RRM MIAMI      (ATT: Lori Bearden)
Street and Apt. No., or PO Box No.
   401 N. Miami Ave-
City, State, ZIP+4
   Miami, Fl- 33128
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7021 2720 0000 4137 7874

physical/Actual
Copy of mail to
BOP for Comp Release
   & receipt



U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com.

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$
Sent To  RRM MIAMI      (ATT: Lori Bearden)
Street and Apt. No., or PO Box No.
   401 N. Miami Ave-
City, State, ZIP+4
   Miami, Fl- 33128
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7021 2720 0000 4137 7874

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.

From: Shapiro    Nevin    61311-050    Miami RRM
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A- INMATE REQUEST**

I am seeking compassionate release based on extraordinary and compelling reasons related to the care and support required for my elderly parents. I have been on home confinement under The CARES Act since June 11, 2020 and have clear conduct since then. My release date is June 29, 2026. My Compassionate Release will provide the opportunity to present my rehabilitation, release plan and the need to provide care for my parents

1/24/23
DATE    SIGNATURE OF REQUESTER

**Part B- RESPONSE**

_____    _____
DATE    WARDEN OR REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE    CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____        _____    BP-229(13)
DATE    RECIPIENT'S SIGNATURE (STAFF MEMBER)    APRIL 1982
USP LVN

## Compassionate Release-Nevin Shapiro#61311-050

**N Shap** <nshap69@gmail.com>
To: CMM-CCM-S (BOP) <CMM-CCM-S@bop.gov>                    Mon, Jan 30 at 1:40 PM

Ok, thank you.It was supposed to deliver this past Friday. Thank you for your quick response.
[Quoted text hidden]

**CMM-CCM-S (BOP)** <CMM-CCM-S@bop.gov>
To: N Shap <nshap69@gmail.com>                    Mon, Jan 30, 2023 at 10:39 AM

I have not received anything yet.

**From:** N Shap <nshap69@gmail.com>
**Sent:** Monday, January 30, 2023 1:33 PM
**To:** CMM-CCM-S (BOP) <CMM-CCM-S@bop.gov>
**Subject:** [EXTERNAL] Compassionate Release-Nevin Shapiro#61311-050

Lori P. Bearden
RRM Miami
RESIDENTIAL REENTRY OFFICE
401 N MIAMI AVENUE
MIAMI, FL 33128

Mrs.Bearden,

Good afternoon, my name is Nevin Shapiro #61311-050 and I am part of the WPB RRM. I just sent to you by Certified Mail in the form of an administrative remedy BP-10 a filing of a compassionate release form. I was given this email address from the office that I am under supervision with and all questions we were directed to ask at this email address. Could you let me know that you received my BP-10 by response on this email and I wouldn't expect to receive approval though I need to before I file directly with my sentencing Judge. Please advise and Thank you in advance for your cooperation in this matter.

Best regards,

Nevin Shapiro#61311-050



# USPS® Visual Call

Our systems show
Your item was delivered to an individual at the
address at 11:11 am on January 26, 2023 in
MIAMI, FL 33128.
Press Next to Continue

# EXHIBIT B

22

# TABAS FREEDMAN
### Attorneys

One Flagler Building
14 Northeast First Avenue, Penthouse
Miami, Florida 33132

Telephone 305.375.8171
Facsimile 305.381.7708
www.tabasfreedman.com

Gary M. Freedman
gfreedman@tabasfreedman.com

April 26, 2013

Ad Hoc Committee on Attorney Admissions

Re:    **Capitol Investments USA, Inc. (Case No.: 09-36408-BKC-LMI) and Nevin Shapiro (Case No.: 09-36418-BKC-LMI) (collectively, the "Debtors")**

**IN RE: REFERENCE TO AD HOC COMMITTEE ON ATTORNEY ADMISSIONS, PEER REVIEW AND ATTORNEY GRIEVANCE FOR THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA**

Dear Sir/Ms.:

My name is Gary Freedman and I am writing at the request of Maria Elena Perez.

My firm has served as counsel for Joel Tabas since his appointment as Chapter 7 trustee of the jointly administered bankruptcy estates of Capitol Investments USA, Inc. and Nevin Karey Shapiro in December 2009. I have served as lead counsel since the commencement of the representation. Based on the nature of these cases, Mr. Tabas's principal charge, and by virtue of our representation of him, our charge, has been to recover the losses suffered by the lenders/investors in the Capitol Ponzi scheme.

At the time that we became involved in this matter, Mr. Shapiro was represented in the bankruptcy cases by Peter Valori of Damian & Valori and represented in his criminal matters by Guy Lewis and Michael Tein of Lewis Tein. Sometime in April 2010, Maria Elena Perez substituted for Lewis Tein as Mr. Shapiro's criminal counsel. At that point, Mr. Shapiro indicated that he intended on cooperating with the Trustee in his recovery efforts and, ultimately, with the assistance of Ms. Perez, executed on behalf of the Trustee a waiver of his attorney-client privilege so that the Trustee would be able to expand his investigation.

Tabas, Freedman, Soloff, Brown & Rigali, P.A.

Ad Hoc Committee on Attorney Admissions
April 24, 2013
Page 2

Since April 2010, Mr. Shapiro has cooperated with our recovery efforts. That cooperation has been aided by Ms. Perez in various ways, including facilitating communications with Mr. Shapiro and providing us documents that have assisted the Trustee's recovery efforts. Among other things, Ms. Perez has:

(1)   attended all day sessions observing us interview Mr. Shapiro regarding the circumstances of the Capitol Ponzi scheme, the participants in the scheme, the aiders and abettors in the scheme, the nature and sources of the investments in the scheme and potential questions for depositions of third parties;

(2)   attended certain Rule 2004 examinations; and

(3)   provided relevant documents which were instrumental in recovering $400,000 from Lewis Tein.

To date the Trustee has recovered approximately $35 million. We will need to recover approximately another $60 million to make the creditors whole. The Trustee has one last major claim in litigation with respect to which Mr. Shapiro and Ms. Perez have, to date, provided assistance.

Over the past three years, Mr. Shapiro's expressed motivation for cooperating with the Trustee has been:

(A)   to make the victims of the scheme financially whole again and likewise reduce the amount of restitution owed by Mr. Shapiro in his criminal case; and

(B)   to attempt to reduce his sentence.

With respect to the funds we recovered from the University of Miami – both for direct disbursements to the University and for the benefits received by the University's student athletes – were the result of claims made by us for the recovery of its receipt of fraudulent conveyances derived from the Ponzi scheme under bankruptcy and state law. None of our efforts in this regard related to any expression by Mr. Shapiro of his seeking to exact revenge on the University of Miami nor has he ever expressed such a sentiment to us.

When Mr. Shapiro commenced cooperating with us, he expressed a desire for us to conduct the Rule 2004 examinations of Sean Allen and Michael Huyghue, among others. We declined. Thereafter, we were aware that Ms. Perez was conducting the Rule 2004 examinations of Mr. Allen and Mr. Huyghue. My colleague, Andrea Rigali, listened telephonically to the Rule 2004 examination of Michael Huyghue.

We were not contacted by the NCAA until the Friday evening before the scheduled Monday Rule 2004 examination of Marc Levinson of Shook, Hardy & Bacon,

Tabas, Freedman, Soloff, Brown & Rigali, P.A

Ad Hoc Committee on Attorney Admissions
April 24, 2013
Page 3

and that was only to inform me that an NCAA representative planned on attending the examination if there was no objection. As Rule 2004 examinations are open to the public, we did not oppose his attendance. Based upon the NCAA representative's request, we provided him copies of the transcripts of Marc Levinson and Steve Naclerio. The only other contact we had with the NCAA was by Mr. Weinstein and his colleague with respect to his investigation of the matters relating to the NCAA's relationship with Ms. Perez.

Very truly yours,

Gary M. Freedman

cc:    Joel L. Tabas
       Andrea L. Rigali
       Maria Elena Perez (via e-mail)

Tabas, Freedman, Soloff, Brown & Rigali, P.A.

Dr. Timothy P. Hedley
30 Old Oak Road
Darien, CT 06820

The Honorable Susan D. Wigenton
Martin Luther King Building
& U.S. Courthouse
50 Walnut Street
Newark NJ 07102

Dear Judge Wigenton,

I am pleased to write this letter on behalf of Mr. Nevin Shapiro. By way of introduction, I am a recently retired forensic partner and global leader of Fraud Risk Management services at KPMG LLP. Currently, I am an executive in residence at Fordham University, where I have taught for the past twelve years. Among other courses, I teach Business Ethics, Managerial Accounting, and Business Risks in a Global, Digital Economy. Numerous times, Mr. Shapiro has graciously agreed to present to and talk with my students without compensation or consideration about his story.

For over 30 years, I have been teaching full- and part-time, and I can say that I have had few guest speakers who delivered such a powerful message about the importance of judgment and business risk. Mr. Shapiro delivers his presentations in an understated manner that, at first, subtly hides the power of his message. As his presentations continued, my students realized that the story was grave and tragic. It was a story of someone who lost his moral compass and would pay a heavy price for that lapse. But also a story of a man who, after much introspection, demonstrates remorse and contrition. After Mr. Shapiro's lectures, my students always thanked me for allowing him to talk to the class. The students find that his message is powerful, and it is invaluable to have him speak in venues like my classes, where young professionals can learn about their decisions' consequences.

While working with Mr. Shapiro in my classes, I have found him to be a forthright individual who understands and regrets the actions that led to his incarceration. Also, I believe with the lessons he has learned during imprisonment, he can make a meaningful contribution to society if released from custody. Based on this belief, I have no hesitation in recommending Mr. Shapiro for compassionate release.

Please get in touch with me directly if you have any questions or if I can provide further detail. You may reach me at the address above or at 646-620-9600.

Best regards,

*Timothy P. Hedley*

Timothy P. Hedley, Ph.D., CPA, CFF, CFE

# EXHIBIT D

24

Nevin Shapiro.
8045 Whispering Palm Dr,
Boca Raton, FL 33496

March 16, 2023

Honorable Judge Wigenton:

I was sentenced in June 2011 in your Court to a term of 240-months.

Prior to sentencing, my attorney presented me with a plea agreement that I presumed had been negotiated with prosecutors. However, I learned when I was in your Court at sentencing that such an agreement could be escalated with multiple upward departures leading to a sentence twice that of what I envisioned.

Even with such a sentence, I took responsibility for my actions and immediately started to become a better person. The first step I took was to work at recovering funds by assisting the trustee of my company to recover as much money as possible for investors, many of whom became personal friends over the years of doing business. It was important to me to restore those individuals and lay the groundwork to emerging from this as a better person. I continue to work today on recovering funds and am confident that my continued work to support investors will lead to additional funds being recovered.

During my prison term I was reflected daily on becoming a better person. I reclaimed my religion of Judaism in a way that I had never before, thinking deeply about faith and its influence in my life. In doing so, I could not have imagined being transferred to home confinement under the CARES Act on June 11, 2020, but neither could I have imagined that my own poor health would have been a contributing factor to that transfer. Skin cancer, which was not diagnosed for years while I was in prison, and heart issues had me in tough shape in my final few years inside prison.

I harbor no ill will and take what has happened to me a salvation from GOD to give me the rest of my life through a different lens. I have lectured via Zoom more than 10 times to universities and am planning on speaking to Harvard Law this coming semester with regards to the pitfalls of making poor decisions when the right decision was right in front of me. I am not paid for these events and do them as part of continued growth to use this terrible experience in my life to help others either avoid the mistakes I made or detect them within the corporations where they will someday work.

I am the caretaker of my parents both 75 and 78 respectively. My mother suffers from Dementia and my father had a stroke 6 weeks after I came home and I'm so thankful I was home when that happened. I've been home for just about 3 years and that is what is approximately left on my sentence. I want to continue to assist my parents who will steadily decline in health in the upcoming years and become more dependent on a caretaker. As an only child, I accept that I am that person and have taken on that role as much as possible since being on home confinement.

Page 2

I am humbly requesting that you see it in your heart to forgive these remaining 3 years of my prison term, which were the result of an upward departure at sentencing. I believe I can offer society more as a free man but still on supervised release to honor the sentence imposed. I can also focus on business opportunities that can go toward making a productive living, caring for my parents and repaying restitution.

I could have done nothing when I received a harsh sentence but my parents did not raise me that way and my moral conscience would not rest with the imposition of the sentence. I have paid a considerable price and a significant debt to society thus. I also have worked to lay a path to continue as a meaningful and productive member of society.

Please consider my humble request.

Respectfully,

Nevin Shapiro

# EXHIBIT E

B"H



## THE ALEPH INSTITUTE

9540 Collins Ave • Surfside, FL 33154
Phone: 786-383-2632 • yw@aleph-institute.org • www.aleph-institute.org

**Rabbi Y. Weiss**
*Advocacy Department*

**Chairman / Founder**
Rabbi Sholom D. Lipskar

**President**
Lloyd S. Rubin

**Board of Directors**
Robert Danial
Boruch Duchman
Joy Fishman
Stephen Fiske
Russel Galbut
Reuven Herssein
Daniel M. Holtz
Alberto Kamhazi
Sonny Kahn
Rabbi Aaron Lipskar
Rabbi Sholom D. Lipskar
Morris Mendal
Lloyd S. Rubin
David Schottenstein
Ryan Shapiro
Eric Stein
Sylvia Urlich

**Executive Director**
Rabbi Aaron Lipskar

**Director of Operations**
Moshe N. Barouk

**Director of Outreach Programs**
Rabbi Menachem M. Katz

**Director of Military Programs**
Rabbi Sanford L. Dresin

**Director of Advocacy**
Rabbi Zvi Boyarsky

**Director of Outreach Programs**
Rabbi Shua Brook

**Chief Financial Officer**
Yosie Lipskar

❈   ❈   ❈

**Programs Coordinator**
Moshe Blizinsky

**Prisoner Services Coordinators**
Jose Crespin

**Family Services Coordinators**
Pamela Elfenbein
Valerie Mafdali

❈   ❈   ❈

Spark of Light Prison Program

Operation: Enduring Traditions

Alex F.E.E.L.S Family Program

Golden Age Seniors Program

Lawyer's Network for Alternative
    Sentencing & Transitions

Center for Religious Freedom
    & Family Advocacy

Center for Halacha
    & American Law

President Donald J. Trump
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Re:    Petition for Clemency on Behalf of Nevin K. Shapiro
Reg. No. 61311-050

September 6, 2019

Dear Mr. President:

I write on behalf of the Aleph Institute with the deepest respect for your integrity, courage and straightforward and handling of our country's issues both foreign and domestic. One such domestic issue is justice reforms including prison reforms through the historic First Step Act as well as the granting of clemency to those who have served appropriate time (and more than appropriate time) for their offenses.

We are so deeply grateful for your wise recognition that overzealous prosecutors can, and sometimes do, inappropriately overcharge less culpable individuals and undercharge or even fail to charge more culpable persons involved in the same offenses. This is especially true in the case of Nevin K. Shapiro about whom I wrote to you about back in July of 2018, see that letter enclosed. I am writing today to follow up on that letter as I believe Mr. Shapiro's case is the ultimate prime candidate for a commutation of sentence. If any reasonable person looks at the facts of this case, as I will attempt to describe in this letter, an excessive sentence like this simply boggles the mind.

Pursuant to a plea agreement, Mr. Shapiro is serving 20 years (240 months) on one count each of Securities Fraud (18 USC 371), Wire Fraud (18 USC 1343) and Criminal Transactions (18 USC 1957). By way of comparison, the maximum guideline range for a terrorist who detonates a bomb in a public space with the intention to kill, and a rapist of a 10-year-old child is 235 months and 210 months, respectively. Both result in a lesser sentence, then the appalling 240-month sentence imposed on Mr. Shapiro. He truly got a raw deal, with lawyers who only milked him for enormous fees but did almost nothing for his defense

As you know, the Aleph Institute, a 38-year old Jewish NGO for individuals in limited environments. We are recognized as such by the Department of Justice and Department of Defense, and we especially value our close working relationship with the Federal Bureau of Prisons. The Aleph Institute, which was launched in 1982 in the chambers of the Honorable Jack Weinstein (EDNY), has been serving society by: (1) providing critical social services to families in crisis; (2) addressing the pressing religious, educational, humanitarian and advocacy needs of individuals in the military and institutional environments; and (3) implementing solutions to significant issues relating to our criminal justice and sentencing system, with an emphasis on families, faith-based rehabilitation and preventive ethics education.

Mr. Shapiro is 50-year-old. He surrendered at FBI Headquarters on April 21, 2010 with both of his aged parents by his side. He is currently housed at Montgomery FPC with a projected release date of November 9, 2027. He has served more than nine years. That is more time than was served by former CEO of Tyco Dennis Kozlowski (96 months) and former Vice-President of Computer Associates (84 months) both of whom were convicted in billion-dollar fraud schemes. According to the Third Circuit Court of Appeals, the loss to investors in Mr. Shapiro's case was $82,000,000[1] though one could make a very compelling argument that the loss amount should be substantially less than that.

Mr. Shapiro was the principal of Capital Capitol Investments (hereinafter "Capital") which was engaged in the wholesale distribution business including groceries and other consumer products. This was a legitimate and profitable business. Furthermore, the evidence is clear that Mr. Shapiro went into this business wanting everything to be on the up and up. In fact, he hired a private investigator (former police officer) – who I personally spoke to – whose job was to investigate all potential investors to make sure everything was kosher. His name is Pat Franklin. This clearly represents Mr. Shapiro's frame of mind and intent to do everything properly. Mr. Franklin explained to me the background of this case; I was just blown away by the injustices of this case and what Mr. Shapiro has gone through.

As part of its business, Capital invested tens of millions of dollars in China Glass, a glass container import business run by Craig T. Currie. By 2006, it was clear that Currie had defaulted on these loans causing Capital to no longer be viable financially. Yet, Capital's lawyers, Shook, Hardy and Bacon ("SHB"),[2] primarily through its associate Marc Levinson, Mr. Shapiro's childhood friend from age six, continued to advise Mr. Shapiro that he needed to continue borrowing money from Capital's investors.

---

[1] United States v. Shapiro, 505 Fed. Appx. 131, 131.
[2] In 2012, The National Law Journal ranked the firm as the 87th largest in the United States.

2

According to the Indictment there were three unindicted coconspirators (Pacer Document 12 at page 23). Craig Currie's lawyer at the time was the infamous Paul Bergrin whose license to practice law was suspended by the New Jersey Supreme Court in 2009, and he was sentenced to life in federal prison for multiple charges in 2013.[3] An April 4, 2007 letter from Bergrin states: "1. Craig Currie agrees to assist and render substituted cooperation in the legal investigation and any civil and or criminal action taken against Nevin Shapiro, his entities, corporations, and affiliates. Furthermore, Mr. Currie will provide any legal documentation to corroborate this position. [And] 2. Currie agrees to provide a forensic accounting relevant to all monies owed and accounts receivable, hereafter known as the Shapiro Accounting by April 11, 2008." (Pacer document 42-13 at page 3).

Robert Kalman was one of Capital's investors who was apparently intent on making Mr. Shapiro pay for his mistakes. The Complaint against Mr. Shapiro repeatedly identifies "RK" as an investor and witness against him. (Pacer Document[4] 1 at pages 6 and 7). Indeed, Mr. Shapiro believes Mr. Kalman initiated the criminal investigation against him.

Currie and his wife Fanny Gallo executed sworn affidavits on May 10, 2007 that Kalman had made unrelenting phone calls and uninvited visits to their home in an attempt to persuade them to admit that they had conspired with Mr. Shapiro to "rip him [Kallman] off" and to help him "get Nevin." Gallo's affidavit states among other things:

- "Mr. Kallman has made frequent threats to go to the prosecutor's office and that he knows a lot of prosecutors."
- "Mr. Kallman has told me "I will crush Nevin's balls";
- "Mr. Kallman has told me that he can help me and he doesn't want to see me go to jail, if only I will admit to him that my husband, Craig Currie, and Nevin Shapiro "ripped him [Kallman] off";

(Pacer Document 42-22 at page 2 and Pacer Document 42-23 at pages 2-2).

In a May 8, 2008 letter, Currie's lawyer, Paul Bergrin, wrote to Mr. Shapiro's then lawyer, Marc Levinon of SHB, stating: "The account records of China Glass USA, Inc., depict that at least 1.8 million dollars was stolen and received by Shapiro." Therein, the now disgraced lawyer Bergrin accuses Mr. Shapiro of a host of financial improprieties based on various documentary proofs including "information provided by federal agents involved in the criminal investigation." Bergrin states, "I implore

---

[3] https://en.wikipedia.org/wiki/Paul_Bergrin
[4] Pacer Documents refer to documents listed in the Pacer Docket of USA v. Shapiro USDC DNJ Case No. Case 2:10-cr-00471-SDW.

3

you to consider advising your client to settle this matter for monies due and owing to Craig Currie and Robert Kallman." (See Pacer Document 42-20 at page 3). This, of course, is contrary to the above-mentioned affidavits of Currie and Gallo.

Bergrin's May 2, 2008 letter is even more at odds with Gallo's March 11, 2010 deposition confirming that Mr. Shapiro never asked her to commit any fraud. (Pacer Document 42-32 at page 4 [depo page 6]). Fanny Gallo further testified that Mr. Shapiro funded her husband's grey market diversion deals which he failed to repay (Id. Depo pages 6-9). Fanny Gallo also confirmed that Robert Kallman and Craig Currie together went "behind Nevin's back" and did deals together, and that Craig T. Currie actually instructed Robert Kallman to deposit money in Fanny Gallo's account so that they could conduct business behind Mr. Shapiro's back. (Id. Depo pages P. 14-16). Fanny Gallo also testified that Craig Currie and Robert Kallman were "conspiring" against Mr. Shapiro and that Craig Currie actually physically threatened her, including threatening to kill her. (See Exhibit "32" at P. 16-17).

While these revelations may not fully exonerate Mr. Shapiro, they strongly suggests that Mr. Shapiro was the victim of Craig Currie, who diverted Capital's funds (which it raised from its investors such as Kalman) which were intended for China Glass for his own purposes and then defaulted. Moreover, it appears Mr. Currie who was in large measure culpable for the loss which caused Mr. Shapiro to be subjected to such a long sentence, escaped all criminal liability by making a deal with the prosecution in exchange of testimony against Mr. Shapiro. The entire scenario also raises uncomfortable questions as to what the relationship was between the USA's office and Mr. Kalman and to what degree Kalman seemingly instigated and drove Mr. Shapiro's prosecution.

Also troubling is the government's refusal to provide copies of all of its statements by Currie and others only offering to show them to Mr. Shapiro's then attorney Maria Perez thereby preventing her from reviewing them with her client. (See June 1, 2011 email exchange, Pacer Document 42-4 at page 2).

In an email the following day, June 2, 2011 (Pacer Document 42-5 at page 2), AUSA Jacob T. Elberg makes the following interesting admissions:

-The Government does not contest the fact that, at some point in time prior to August 2007, Nevin Shapiro did have at least some legitimate business through Capitol Investments USA, Inc.

-The Government takes no position as to whether or not Craig Currie, at some point prior to August 2007, engaged in misconduct which resulted in Nevin Shapiro losing money.

4

Between the highly questionable advice given to Mr. Shapiro by his attorneys, Currie's culpability in causing the loss which was the principle factor in the length of Mr. Shapiro's sentence, the apparent influence investor Kalman had with the prosecution and Kalman's coercion of Currie and Currie's subsequent likely perjurious testimony against Mr. Shapiro, it was a perfect storm of deception and misconduct resulting in the practical destruction of Mr. Shapiro's life.

I have come to know Mr. Shapiro and highly recommend him for this Presidential relief. He will get the support, encouragement and involvement of the community to help him succeed in a new chance in life, thus making him an excellent candidate.

Mr. Shapiro has been a model inmate. I was personally told by the staff at his facility that he is a pleasure to deal with and extremely respectful. Mr. Shapiro is remorseful for his crime and wishes to grow and rehabilitate from this experience. As I noted in my previous letter, he has utilized his time wisely in prison, taking numerous classes and participating in many rehabilitative programs. He is a better a person.

Indeed, in my capacity with the Aleph Advocacy Department, I have come to know Nevin Shapiro and have been able to see his rehabilitation process up close. Since his incarceration, Mr. Shapiro has gotten more and more involved with his Jewish faith—in prayer, Torah study and performance of the commandments and traditions as required by Jewish law. It is evidenced based, and we have seen first-hand, that religious practice greatly assists an inmate with his rehabilitation, thus decreasing his chances of recidivating.[5] I correspond with Mr. Shapiro regularly and I can tell you that I feel he is *sincerely* remorseful for his misdeeds. He knows he committed a crime, he knows it was deeply unwise and he takes full and complete responsibility. Mr. Shapiro writes, "I am indeed 'guilty' of some form of :criminal misconduct, so extremely remorseful as to the disposition of my circumstances and have had and continue to have Every single intention of seeing my lenders/victims in my case be made whole as evidenced by the work I have done this far with the trustee appointed in my case by the Department of Justice...I knew in my gut intuition that there was something wrong with my conduct and simply should have found the right path to begin to attempt to resolve this matter for better or for worse." (See Clemency

---

[5] See also Bryon R. Johnson, et al., Religious Programs, Institutional Adjustment, and Recidivism among Former Inmates in Prison Fellowship Programs, 14 Justice Quarterly 145, 148 (1997); see also Todd R. Clear, et al., Does Involvement in Religion Help Prisoners Adjust to Prison?, NCDD Focus 1 (Nov. 1992); Todd R.Clear & Marin Myhre, A Study of Religion in Prison, 6 Int'l Ass'n Res. &Cmty. Alts. J. on Cmty. Corrs. 20 (1995); Byron R. Johnson, Religiosity and Institutional Deviance: The Impact of Religious Variables upon Inmate Adjustment, 12 Crim. Just. Rev. 21 (1987); Bryon R. Johnson, et al., A Systematic Review of the Religiosity and Delinquency Literature: A Research Note, 16 J. Contemp. Crim. Just. 32 (2000); Byron R. Johnson, Religious

5

Application at page 15). His faith in G-d is now tremendously strong and I am certain this will keep him on the right path.

Mr. Shapiro had no prior criminal record. We submit that his 240 -month year sentence is excessive, and that the more than nine (9) years which Mr. Shapiro has already served is sufficient punishment. Importantly, Mr. Shapiro is asking for a commutation for this sentence, not a pardon. He understands the seriousness of his crime and does not beseech forgiveness. Instead, this is simply about fairness and justice. He has paid his debt to society. Furthermore, there is evidence pointing to significant prosecutorial misconduct which only adds to the injustices of this case.

Notably, Mr. Shapiro has gone above and beyond in helping the U.S. Trustee collect millions of dollars back to the victims, none of which would have happened without Mr. Shapiro's assistance. This is a very rare thing and reflects Mr. Shapiro's upstanding character as well as his sincere remorse.

I have to admit that it is rare that we find inmates who has utilized his time as wisely as Mr. Shapiro. We have also heard from staff that he is very helpful to other inmates in need. We believe this clearly demonstrates how laser-focused he is on being a productive and responsible citizen, leading a good life here on in.

Mr. Shapiro's family consists only of his parents. Mr. Shapiro's parents are elderly and desperately need him home with them. Sadly, his mother is 71 years old and suffers from many ailments; it would be a tremendous blessing for her to have his assistance and support. Nevin is the appointed Health Care surrogate for his mother as she has just been recently diagnosed with early stages dementia, as well as acute emphysema. His father is 74 years old. Mr. Shapiro has a place to live in Delray Beach, Florida. He is an only child. His parents will not only give Mr. Shapiro a place to stay, but his return will enable him to care for his parents.

Close friends are ready and willing to provide Mr. Shapiro with the necessary moral support and employment contacts. The Aleph Institute will assist with this as well to help him successfully re-enter society.

On a more general basis, we believe this commutation is called for and necessary as it is one small step to fixing the incredible problem of prison overpopulation and over-sentencing plaguing our nation. We have more people in prison per capita—one out of every 100 American adults—than any other country in the world. And though the states are now seeing a decrease in their prison population, the federal prison population has increased at a staggering rate of 800%. Due to overcrowding, our federal prisons are less safe because of it. It is excessive sentences such as his that have contributed to this prison crisis.

We believe that Nevin Shapiro's sentence is a fundamental miscarriage of justice that the Presidential commutation power is in the best position to remedy.

6

Indeed, it is fair, right and just to commute Mr. Shapiro's sentence to time-served or as close to that as possible. He is a first-time non-violent offender, he was not a drug leader, he has a clean record in prison, he does not present a threat to public safety, and he was sentenced to an inappropriate sentence of 240 months under out-of-date laws.

The United States is a country founded on compassion and benevolence and we ask, Mr. President, that you express those fundamental attributes with this commutation. Mr. Shapiro is a perfect candidate for commutation and we beseech that you indeed grant this heartfelt request.

May G-d bless you and may He bless these United States of America.

Respectfully submitted,

Rabbi Y. Weiss
The Aleph Institute

cc:    Office of the Pardon Attorney
       1425 New York Avenue NW
       Suite 11000
       Washington, D.C. 20530

7

NEVIN SHAPIRO
8045 Whispering Palm Dr.
BOCA RATON, FL. 33496

7022 3330 0002 0868 6204



RDC 99   07102

U.S. POSTA
FCM LG EN
BOCA RATO
33432
MAR 18 23
AMOUNT
$10
R2305K1398

RECEIVED
MAR 27 2023
Chambers of
Honorable Susan D. Wigenton





United States District Court
for
District of New Jersey

Martin Luther King Bldg & U.S. Courthouse

50 Walnut St. (Courtroom 5LK5C)

Newark, NJ 07102        U.S. District Court
                        Judge Wigenton



RECEIVED
MAR 24 2023
AT 8:30
CLERK U.S. DIST.