# FEDERAL PUBLIC DEFENDER
### DISTRICT OF NEW JERSEY
K. ANTHONY THOMAS, FEDERAL PUBLIC DEFENDER



1002 BROAD STREET • NEWARK, NEW JERSEY 07102 • (973) 645-6347

---

August 29, 2023

Hon. Susan D. Wigenton, U.S.D.J.
Martin Luther King, Jr. Fed. Bldg. & U.S. Courthouse
50 Walnut Street, Room 5060
Newark, New Jersey 07101

        Re:    United States v. Nevin Shapiro
                  Crim. No. 10-CR-00471 (SDW)

Dear Judge Wigenton:

      Nevin Shapiro, through counsel, respectfully submits this letter brief in supplemental support of his pro se motion for compassionate release, filed on March 27, 2023. ECF 53 ("Pro se brief"). Because the pro se brief covers the necessary statutory framework and procedural history and sets forth the grounds on which Mr. Shapiro moves for compassionate release, this letter is submitted only to update the Court and provide additional support for a reduction of his sentence to time served, which would enable him to begin serving his three-year term of supervised release.

**I. Extraordinary and compelling reasons justify reducing Mr. Shapiro's sentence of imprisonment to time served and permitting him to begin serving his three-year term of supervised release.**

      In *United States v. Andrews*, the Third Circuit found the District Court "did not err when it consulted the text, dictionary definitions, and the policy statement to form a working definition of 'extraordinary and compelling reasons.'" 12 F.4th 255, 260 (3d Cir. 2021)), *aff'g* 480 F.Supp.3d 669 (E.D. Pa. 2020) (denying motion and holding that compassionate release statute could not be used to circumvent retroactivity provision of First Step Act's amendment to 18 U.S.C. § 924(c)). That analysis led the District Court to conclude that "there are extraordinary reasons where there are uncommon or unusual circumstances, and there are compelling reasons where continued imprisonment would

result in a significant or collateral harm to the defendant." *Andrews*, 480 F.Supp.3d at 685–86. Mr. Shapiro's circumstances, when considered as a whole, satisfy both prongs and warrant relief.

> **A.    Mr. Shapiro's health conditions, caretaking responsibilities for his elderly, ill father, and successful reentry constitute extraordinary and compelling reasons justifying a reduction of his sentence to time served.**

To briefly review, on June 7, 2011, Mr. Shapiro was sentenced to 240 months in prison, reflecting an upward variance from the advisory guidelines range of 168 to 210 months, to be followed by a three-year term of supervised release. *See United States v. Shapiro*, 505 F. App'x 131 (3d Cir. 2012).  Assuming receipt of good time credit, a person sentenced to 240 months of imprisonment would serve approximately 204 months of that custodial sentence. Mr. Shapiro has been in federal custody since his arrest on April 21, 2010. PSR, p. 1. As of the date of this writing, then, he has served a little over 160 months of his custodial sentence, which amounts to 78% of the 204 months.

On June 11, 2020, he was released by the Bureau of Prisons ("BOP") pursuant to the CARES Act and has been serving his sentence on home confinement, while still in the custody of the BOP, since then.[1] His release date is currently June 29, 2026.[2] A reduction of his custodial sentence would allow him to begin serving his term of supervised release, which would provide reassurance to the Court that Mr. Shapiro remains subject to the possibility of returning to prison should he violate the terms and conditions of supervised release.

---

[1] *See* Office of the Attorney General: Home Confinement Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 88 FR 19830, 19831 (April 4, 2023) ("An inmate placed in home confinement is not considered released from Bureau custody."). This final rule is available at https://www.federalregister.gov/documents/2023/04/04/2023-07063/office-of-the-attorney-general-home-confinement-under-the-coronavirus-aid-relief-and-economic.

[2] Available at Bureau of Prisons website, https://www.bop.gov/inmateloc/.

Since his release, Mr. Shapiro has focused on caring for his elderly father, who suffered a stroke soon after Mr. Shapiro's release, *see* Pro se brief at 9, and on rebuilding his own life.[3] As the letter submitted by Timothy P. Hedley, Ph. D., an executive-in-residence at the Gabelli School of Business at Fordham University, demonstrates, Mr. Shapiro is insightful and reflective about the conduct leading to his conviction. *See* Pro se brief, Exhibit C.

Mr. Shapiro has made it a priority to speak to students and others about the harm his decisions caused in order to prevent them from going down a similar path. For example, he was a guest speaker in Dr. Hedley's class "Business Risks in a Global Business Economy." He spoke about the kinds of decisions he had to make while running a business and was candid about the many bad decisions he had made. According to Dr. Hedley, Mr. Shapiro was an engaging speaker whose candor served as something of a "warning story" to students. Similarly, Mr. Shapiro recently spoke to a group of rabbis about his experience in prison and his reconnection with his faith.

Mr. Shapiro has also cooperated in efforts to recover losses to investors. *Id.*, Exhibit B. And he has presented no "accountability issues" while on home confinement, according to Imore Philips, a senior case manager at the Salvation Army (West Palm Beach) RRM. Reflecting the trust he has earned, he is not required to wear a monitoring device. All of this demonstrates that he presents no risk of recidivism or danger to the public.

Mr. Shapiro anticipates the government's response that where he is doing well and living at home with his father and stepmother, rather than in a halfway house, there is no reason to reduce his sentence. But continued CARES Act release is not guaranteed. Mr. Shapiro is still serving a federal criminal sentence. He remains in the custody of the

---

[3] Mr. Shapiro hoped that his mother would be able to move from Canada so he could care for her as well, but that has not worked out as of yet. He believes that he would be better able to work to facilitate her move were he on supervised release rather than home confinement.

Bureau of Prisons, and the home confinement he is serving demands compliance at the risk of being remanded to serve the remainder of his sentence of imprisonment in prison. For example, even though he does not wear a monitoring device, he must request permission to run an errand and must check in when he arrives and when he returns.

Moreover, his release is precarious. Absent this Court's intervention, Mr. Shapiro could spend the remaining time of his custodial sentence under the constant threat of being remanded due to a miscommunication or a change in BOP and/or Department of Justice policy. Gwen Levi, for example, had been released to home confinement under the CARES Act and was doing well but was arrested and returned to custody based on "a possible violation of the rules of home confinement." *See United States v. Levi*, Crim. No. 04-0235, ECF 2085 (D. Md. July 6, 2021). That "possible violation" turned out to consist of "miss[ing] phone calls from officials while attending a computer class." *See* Kristine Phillips, *Woman who was arrested after missing officials' phone call while in computer class is headed home*, USA Today (July 6, 2021).[4] Until the District Court granted Ms. Levi compassionate release, over the government's objection, she spent three weeks in custody, with the possibility that she would be remanded to serve the remainder of her sentence in prison.

The same or similar miscommunication could happen to anyone released pursuant to the CARES Act. Or they could be remanded to prison due to change in policy from one administration to another. *See* Home Confinement Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, A Proposed Rule by the Justice Department, 78 FR 36787, 36791 (June 21, 2022) (describing history of guidance regarding return of prisoners released under CARES Act after expiration of COVID-19 emergency and proposing rule affirming authority of BOP to allow prisoners released under CARES Act

---

[4] Available at Gwen Levi headed home after judge approves compassionate release (usatoday.com).

to remain on home confinement after expiration of COVID-19 emergency).[5] Living in this kind of limbo is not only an emotional weight, but it poses significant personal and financial questions. Should Mr. Shapiro buy a house knowing that he could be remanded at any time? A car? Should he have children? That kind of uncertainty is an obstacle to full reentry, rather than assistance toward it.

In light of Mr. Shapiro's growth in prison, and the strides he has taken since his release to home confinement, these circumstances strongly support reducing his term of imprisonment to time served and allowing him to begin serving his three-year term of supervised release.

### B. Mr. Shapiro's health conditions remain serious but he is managing his care through his own diligence

As Mr. Shapiro's pro se brief describes, he has serious medical conditions. *See generally*, Pro se brief at 12 (describing diagnoses of Hypertrophic Cardio Myopathy, extreme hypertension, and basal cell carcinoma). Since his release, he has managed his own health care needs with the assistance of Medicaid. Were he remanded, his health care would once again be the responsibility of the Bureau of Prisons. Reports have exhaustively documented that the BOP's medical (and other) resources are strained. *See, e.g.*, Walter Pavlo, *Federal Bureau of Prisons medical care falls short of its own policy*, Forbes.com (April 19, 2022).[6] *See also* Associated Press, *Federal Prisons forced to use cooks, nurses to guard inmates due to staff shortages* (May 21, 2021) ("Nearly one-third of federal

---

[5] The final rule was issued on April 4, 2023, with an effective date of May 4, 2023. *See* Office of the Attorney General; Home Confinement Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 88 FR 19830 (April 4, 2023). The final rule confirms that the decision whether to remand a person released pursuant to the CARES Act should remain within the BOP's discretion based on each individual. *Id.* at 19832.

[6] Available at https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=508ec3b65eab.

correctional officer jobs in the United States are vacant, forcing prisons to use cooks, teachers, nurses and other workers to guard inmates.").[7]

These concerns are not new or COVID-specific. A 2016 report issued by the Office of the Inspector General of the Department of Justice found that "recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." Office of the Inspector General, U.S. Department of Justice, Review of the Federal Bureau of Prisons' Medical Staffing Challenges, at i (March 2016).[8] The report further noted that the staffing levels "from fiscal year (FY) 2010 to FY 2014, the BOP's total medical staff was approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal' care." *Id.* at 1. While statistics from 2010 to 2014 might be dismissed as ancient history in this fast-moving world, they are not to Mr. Shapiro. These years overlap with the first few years of Mr. Shapiro's term of imprisonment. The fact that Mr. Shapiro has taken care of his own health needs since his release also supports the relief he requests, as there is an urgent need to reserve the limited resources of the BOP for those who need them.

The threat of being remanded, whether due to a mistake or change in policy, constitutes "a significant secondary or collateral harm to" Mr. Shapiro, sufficient to satisfy the "compelling" prong of the compassionate release statute. *See Andrews*, 480 F. Supp. 2d at 685–86. These circumstances, when considered as a whole, warrant relief.

---

[7] Available at Federal prisons forced to use cooks, nurses to guard inmates due to staff shortages (nbcnews.com).

[8] Available at *https://oig.justice.gov/reports/2016/e1602.pdf*.

    **C.    Concerns about the effective and judicious use of resources are extraordinary and compelling reasons warranting the relief Mr. Shapiro requests.**

Finally, having Mr. Shapiro serve almost three more years on home confinement only to then begin serving his three-year term of supervised release is a wasteful use of resources. The fact is that "[c]ost savings were among the intended benefits of the First Step Act, regarding which Congress cited a need to 'control corrections spending, manage the prison population, and reduce recidivism.'" Office of the Attorney General; Home Confinement Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 88 Fed. Reg. 19830, 19833 (April 4, 2023) (final rule, to be effective May 4, 2023) (citing H.R. Rep. No. 115-699, at 22-24 (2018)).

"[A]n inmate in home confinement costs $55.26 per day." *Id.*, at 19833. That amounts to a little over $20,100 per year. Even assuming that cost does not rise over the next three years, it will cost the public nearly $60,000 to keep Mr. Shapiro on home confinement for almost three more years, only to begin his three years of supervised release. That amount of money could provide services for many more individuals who *need* those services to support successful reentry during their periods of home confinement. To spend it on someone who has demonstrated success under home confinement, and to spend it for nearly three years more, when that same person has three years of supervised release yet to serve, is extraordinarily wasteful. It is, in statutory terms, "greater than necessary" to serve the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

**II.    Reducing Mr. Shapiro's term of imprisonment to time served is consistent with the § 3553(a) factors.**

The relief Mr. Shapiro seeks is consistent with the § 3553(a) factors and the overarching mandate that a sentence be minimally sufficient to serve the purposes of sentencing. Because the pro se brief discusses these factors in detail, this reply will not retread that ground. Instead, Mr. Shapiro respectfully asks the Court to consider his request in light of the reasons and considerations discussed in both his initial brief and

Hon. Susan Wigenton<br>
August 29, 2023<br>
Page 8

this reply and grant his request to reduce his term of imprisonment to time served and permit him to begin serving his three-year term of supervised release.

    Mr. Shapiro thanks the Court for considering this request and submission.

                                          Respectfully submitted,

                                          K. Anthony Thomas
Federal Public Defender

By:    */s Louise Arkel*
Louise Arkel
Assistant Federal Public Defender
Office of the Federal Public Defender
1002 Broad Street
Newark, New Jersey 07102
Louise_arkel@fd.org
973-622-7535
Attorneys for Nevin Shapiro

cc. Chelsea Coleman, AUSA